# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | | |
|---|---|---|
| **GAI KUOT, #507979** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:16-cv-00006** |
| | ) | |
| **CORRECTIONS CORPORATION OF AMERICA** | ) | **Chief Judge Sharp** |
| ***et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Gai Kuot, a state prisoner confined at the South Central Correctional Facility ("SCCF") in Clifton, Tennessee, has filed a civil rights complaint under 42 U.S.C. § 1983 against the following defendants: the Corrections Corporation of America ("CCA"); Damon Hininger, President and CEO of CCA; Jason Medlin, Middle Tennessee Regional Director for CCA; Arvil Chapman, former Warden of SCCF; Cherry Lindamood,[1] current Warden of SCCF; seven other current and former employees of SCCF, including Katherine Buttram, Benjamin Killingsworth, Daniel Dodd, Dan Deavers, Christopher McClain, Mark Hacker, and Hank Inman; Derrick Schofield, Commissioner of the Tennessee Department of Correction ("TDOC"); Jason Woodall,[2] Deputy Commissioner of TDOC; Tony Parker, Assistant Commissioner of TDOC; Joel Foster, liason for TDOC; Bryant Williams, contract monitor for TDOC; Mrs. Rashti, head nurse for TDOC; Jane Doe Nurses #1, #2, and #3; Dr. Robert Coble,[3] doctor and acting health administrator for SCCF; John Doe Doctors #1 and #2; and John Doe Medical Health Services, contractual healthcare provider and employer of Dr. Coble. (ECF No. 1.) All defendants are named in their official and individual capacities. The complaint is before the Court for an initial review pursuant to the Prison Litigation Reform Act ("PLRA").

---

[1] The plaintiff identifies this defendant as "Cheryl" Lindamood, but the Court takes judicial notice that Cherry Lindamood is the current warden of SCCF.

[2] The plaintiff identifies this defendant as Jason "Woodal" in the case caption, but elsewhere in the complaint sometimes identifies him as Jason "Woodall." The Court takes judicial notice that TDOC's Deputy Commissioner of Operations is named Jason Woodall.

[3] The plaintiff identifies this plaintiff variously as Dr. Cobble and as Dr. Coble.

I. **Standard of Review**

Under the PLRA, the Court must conduct an initial review of any civil complaint brought by a prisoner if it is filed *in forma pauperis*, 28 U.S.C. § 1915(e)(2), seeks relief from government entities or officials, 28 U.S.C. § 1915A, or challenges the prisoner's conditions of confinement, 42 U.S.C. § 1997e(c). Upon conducting this review, the Court must dismiss the complaint, or any portion thereof, that fails to state a claim upon which relief can be granted, is frivolous, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2) and 1915A; 42 U.S.C. § 1997e(c). The Sixth Circuit has confirmed that the dismissal standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), "governs dismissals for failure to state a claim under [the PLRA] because the relevant statutory language tracks the language in Rule 12(b)(6)." *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). Thus, to survive scrutiny on initial review, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Nonetheless, in conducting the initial review, the Court must read the plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept the plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

II. **Factual Allegations**

The plaintiff's 145-page complaint is rambling, repetitive, and far-reaching. In summary, the plaintiff alleges that he has been continually subjected to violent physical assaults and abuse at the hands of other prisoners and to a continual and pervasive risk of harm at the hands of other prisoners since he arrived at SCCF in 2012. He also alleges that the defendants have refused treatment for his serious medical needs, including injuries inflicted by other inmates and chronic illnesses diagnosed after the plaintiff arrived at SCCF.

A. **Risk of Harm by Other Inmates**

The plaintiff is a forty-year-old, foreign-born native of South Sudan who is physically small in height and weight and is not affiliated with any Security Threat Group ("STG"). He alleges that, despite his

vulnerability due to his small stature, age, lack of STG affiliation, and the huge language and cultural barriers between him and most of the other inmates, he has continually been housed in units with gang-affiliation rates in excess of 80%. The plaintiff expressly alleges that, throughout the time that he has been incarcerated at SCCF, he has been continually threatened, terrorized, extorted, and assaulted by various violent inmates with STG affiliations. More to the point, for purposes of the present action, the plaintiff contends that the defendants "created conditions which were conducive to the long term viability and sustainability of the control and dominion of violent inmates" affiliated with STGs. (ECF No. 1, at 16.) The plaintiff states that defendants Schofield, Parker, Foster, Williams, Woodall, CCA, Hininger, Medlin, Chapman, Lindamood, Killingsworth, Hacker, Buttram, Dodd, McClain and Inman were all aware of and specifically put on notice that STG-affiliated inmates constituted a serious threat to the plaintiff's health and safety but refused to take any action to protect him. (*Id.* at 16.)

The plaintiff alleges that the defendants' actions were contrary to written TDOC and CCA policy, as well as Tennessee law. He further alleges that defendant Schofield, in conjunction with defendants Woodall and Parker, "implemented *de facto* policies and customs" to ensure that express *written* policies and laws were ignored or violated.

As the plaintiff describes it, STG-affiliated inmates have

the unencumbered right to literally take over substantial portions of the housing unit, (i.e. whole tiers and staircases; and the shower units, ice machine, and exit and entrance to the very housing unit itself, as well as to the individuals cells/cell doors to enter the cells,) and forcing Plaintiff Kuot to have to be subject to the control and dominion of these violent STG affiliated inmates.

(ECF No. 1, at 18.[4]) The plaintiff states that these practices are in violation of written TDOC policy, but that the defendants all knew about and implicitly condoned the activity to such an extent that it became *de facto* policy at the prison to permit such behavior, enforced by SCCF staff. The plaintiff states that, as a result of the STG-affiliated inmates' practices of taking over his housing units, he has been screamed at, slapped, threatened, and physically attacked for purportedly "breaking security" (as defined by the STG members). (*Id.* at 20.) The plaintiff alleges that defendants Chapman, Killingsworth, Dodd, McClain, and

---

[4] The page numbers referenced herein correspond with the page numbering assigned by the Court filing system, CM/ECF and not with the plaintiff's pagination. In any event, the Court notes that Page 16 of the complaint is missing, which apparently contains most of the description of a practice to which the plaintiff refers as "shower escorting."

Buttram knew of and allowed STG-affiliated inmates to conduct "shower escorts" and basically to take over portions of the plaintiff's housing unit, that they knew that inmates including Kuot face a "substantial threat of serious bodily injury from pervasive STG activity," and that they have affirmatively failed to take reasonable steps to mitigate the risk or prevent the injuries. (*Id.* at 21.)

Other activities reported by the plaintiff include STG members' tampering with the locking mechanism of their cell doors so they can enter or exit their cells at any time, even during lockdown; forcing the plaintiff and others to vacate their own cells so that STG members could conduct meetings in the cells; and escorting fellow gang members to and from the showers, taking over entire portions of the housing units while doing so. The plaintiff states that all these activities are caught on camera every day and are done in full view of the defendants.

With regard to his own injuries, the plaintiff alleges more specifically that he has been an inmate detained at SCCF since November 2012 and that he was seriously assaulted for the first time on July 7, 2013, during the first month after his arrival at SCCF, as a result of the above-referenced practices in conjunction with his small stature and lack of familiarity with prison culture. The plaintiff states that he "unwittingly and unknowingly failed to move fast enough out of the path of a shower escort." (*Id.* at 22.) As a consequence, he was told by the STG-affiliated inmates conducting the escort that he had to pay a $100 fine for his transgression. Because the plaintiff lacked the financial ability to pay this "fine," he was punched in the mouth, kicked, and stomped on, suffering contusions to his head, face, ribs, neck, and lower back. (*Id.*) He also suffered impaired vision, headaches, nightmares, and "uncontrollable anxiety." (*Id.* at 23.) The inmates who assaulted the plaintiff were not housed in his unit but were allowed to come into the pod through the front door, because it was never secured as it was supposed to be. The plaintiff states that "[t]his freedom of movement, was a *de facto* policy that C.C.A. staff members, seniors and administration officials had allowed freely and with no restriction." (*Id.* at 22.)

After the assault, the plaintiff was placed in a segregated unit for 18 days without receiving any medical attention, despite having suffered serious injuries. Thereafter he was housed in Discovery Pod B, where, for several weeks, he was "terrorized and violently assaulted" and extorted by inmates who belonged to STGs.

The plaintiff states that he was attacked again several months later by an inmate affiliated with a different STG for using "their" shower, one of the eight showers in the plaintiff's housing pod. (*Id.* at 23.) The plaintiff asserts that the administrative officials at the prison knew of and tacitly permitted this STG to assert a claim of ownership over a particular shower. It is unclear from the plaintiff's allegations if this is the same assault as the one he alleges took place on August 2, 2014. After that assault, he was again moved to a segregated unit, this time for eleven days, where he again received no medical attention. The plaintiff asserts that the lack of medical care following these assaults further compounded the problems the plaintiff was experiencing with headaches, impaired vision, nightmares, and anxiety. The plaintiff states that his physical stature as well as his severe unrelated medical conditions (Hepatitis B and profound bacterial infection of the gastrointestinal tract) make it impossible for him to defend himself, that he has been repeatedly housed with cellmates who are affiliated with one STG or another, and that he has repeatedly been subjected to incidents in which he was terrorized, assaulted and extorted by STG members, under conditions that the defendants permitted to flourish. The plaintiff explains that the extortion consists of STG-affiliated inmates' assessing financial fines and charges against him for "perceived shower security slights" or simply "strong-arming" the plaintiff by telling him he owes them for living in the pod.

In November 23, 2014, the plaintiff was moved to "pre-honor pod Gemini B."[5] The plaintiff remained in this pod until February or March 2015, when defendant Derrick Schofield, TDOC Commissioner, specifically ordered SCCF to terminate its honor pods. The plaintiff alleges that the only time during his tenure at SCCF that he has not witnessed "wide scale organized STG activity, permitted and condoned by the administration," was while he was housed at the pre-honor pod. (ECF No. 1, at 15.) After the reorganization, he was again subjected to continuous extortion and assaults and put in constant fear for his life.

The plaintiff maintains that, to the present day, he remains under a "pervasive threat of serious bodily injury due to the rampant and uncontrolled" activity by STG-affiliated inmates, and that the "[c]onditions of rampant and widespread participation in coordinated STG activity were a direct result of

---

[5] The plaintiff does not explain what a "pre-honor pod" is.

Defendant Schofield's orders and intentional decisions." (*Id.* at 26.) In support of this assertion, the plaintiff explains that, pursuant to a directive by Commissioner Schofield, numerous inmates have been downgraded from maximum-security classification and released into the general medium- or minimum-security level population at SCCF, simply in order to reduce prison costs. According to the plaintiff, these inmates know that they are not likely to be placed back into maximum security or in segregation, even for egregious behavior. The plaintiff states that it is common knowledge among prison staff and inmates that defendants Schofield, Woodall, and Parker implemented state-wide policies pursuant to which CCA and TDOC prison staff were (1) discouraged from reporting assaults as assaults, in order to hide the true level of violence at TDOC prisons; (2) encouraged to reduce the number of STG members in maximum security in order to save money and reduce costs; (3) directed to create a "militaristic environment" in which plaintiff and other inmates were made to suffer for no real reason. (*Id.* at 26.) Thus, even though the plaintiff reported his victimization and attacks to the defendants, the inmates responsible for the attacks were never punished or subject to any adverse consequences for their actions. And, in fact, according to the plaintiff, the victimizers were aware that they would not be subject to punishment or adverse consequences.

The plaintiff alleges that he specifically reported the assaults and his continued fear for his safety to defendants Chapman, Killingsworth, Dodd, McClain, Buttram, and Hacker. He was repeatedly told not to be weak and that mere fear of gang attacks was not sufficient to warrant protective custody. Instead, he would have to be a snitch or report being in possession of dope, a telephone or some other contraband to go into protective custody. (ECF No. 1, at 29.) In other words, the plaintiff explains, he would have to engage in criminal conduct punishable by more time in prison in order to qualify for protective custody.

After his first assault, the plaintiff spoke with defendant Buttram, who did nothing and did not report his injuries to medical. The plaintiff specifically requested that Warden Chapman place him in protective custody after the first assault, but the warden refused. The warden also made no effort to stop the out-of-control and violent behavior by STG members at SCCF. Defendants McClain, Sullivan, and Dodd likewise refused to take any action to protect the plaintiff or to control the gang activity at the prison.

Defendants Lindamood and Deavers came to work at SCCF as warden and assistant warden in March 2015. The plaintiff spoke to Warden Lindamood about his past assaults and the continuing threat the STG members posed to him. Lindamood acknowledged that the situation was "tough" but told him that he had to be careful and that there was nothing she could do about the situation. (*Id.* at 32.) When the plaintiff told her he had written to Schofield about the problems he was experiencing, Lindamood told him the situation was Schofield's fault. (*Id.*) After the plaintiff suffered another inmate assault in April 2015, defendant Deavers told him: "it's dangerous here and the staff is unprofessional, but there was nothing that could be done." (*Id.* at 33.)

After a serious incident in which an inmate assaulted a guard in February 2015, CCA dispatched Jason Medlin, Mid-South Regional Director, to SCCF. When the plaintiff and other inmates attempted to speak to Medlin about the gang activity at the prison, Medlin denied the existence of a gang problem and told the plaintiff he would have to work with his unit team to solve any problems he was having at the institution. Medlin also told the plaintiff that he had seen video footage of inmates engaged in the pod shower escort but that the situation was "not that bad" and inmates needed to stop "whining and do their time." (*Id.* at 34.) Medlin refused to take any steps to ameliorate the gang activity despite express knowledge of it. He also purportedly told the plaintiff that the prison was being run "the way his bosses in Nashville" (i.e., defendant Damon Hininger and other CCA corporate officers) wanted it run. (*Id.* at 34.) The plaintiff reiterates that, for the last three years, defendants Chapman, Dodd, Lindamood, Hacker, McClain, Killingsworth, Deavers, Inman, and Buttram knowingly and intentionally refused to enforce the written STG-affiliation and classification policies, resulting in multiple instances in which the plaintiff was assaulted, injured, and extorted.

The plaintiff asserts that, besides failing to protect the plaintiff from gang activity at SCCF, the defendants also failed and refused to transfer him to a prison with a lower security level where gang activity is not an issue. The plaintiff maintains that, if they had done so, he would not have been repeatedly and continuously victimized over the preceding years.

The plaintiff cites to specific TDOC policies regarding the treatment of gang-related activity and the identification and placement of gang members at TDOC institutions. He alleges that the defendants have knowingly failed to comply with these regulations. He specifically avers that defendant Hank Inman,

institutional STG Coordinator, has been ordered by defendants Chapman, Killingsworth, Dodd, McClain, Buttram, and Hacker not to enforce or abide by these regulations. He asserts that the defendants acted willfully, intentionally, and unreasonably in failing to enforce these regulations and failing to ensure that the plaintiff, specifically, was compatible with the violent, STG-affiliated inmates with whom he was housed.

The plaintiff alleges that the fact that no gang activity is permitted in the federally funded Residential Drug Abuse Program at SCCF, so as not to jeopardize the receipt of federal funds, shows that the defendants could enforce the STG-related regulations elsewhere within SCCF if they chose to, but instead knowingly allow it to continue to occur and knowingly and intentionally fail to train prison staff to control the conduct, or to hire sufficient staff. The plaintiff cites to numerous known and documented instances of inmate-upon-inmate violence, caught on video camera, in which the attackers were allowed to return to the main compound after a mere 30-day stay in HSA. The plaintiff states that he is in possession of "literally hundreds of different examples that he could provide which would constitute objective credible evidence of the same pattern of deliberate indifference" that caused his injuries beginning in November 2012, and that the defendants have been and continue to be deliberately indifferent to the unfettered, violent STG activity, uncontrolled movement between cells by STG members, and dangerous interference with door-locking mechanisms by STG members. (*Id.* at 45.) As a result, the plaintiff has lived in "utter fear and terror of being attacked" and even killed throughout his imprisonment at SCCF. (*Id.* at 48.)

In his 145-page complaint, the plaintiff includes numerous other allegations about the defendants' policy-level failures, and statements by individuals including Jerry Lester, former warden of the West Tennessee State Penitentiary, who testified under oath before a Tennessee State Senate Select committee that there has been "[pervasive] violence as a result of sweeping policy changes" at TDOC, specifically including Commissioner Schofield's "decision to reclassify about half of the system's maximum security inmates" in order to reduce costs. (ECF No. 1, at 68 (purportedly quoting Tennessean article quoting Lester, attached as exhibit to complaint, ECF No. 1-7).)

In summary, the plaintiff alleges that:

(1) as a result of the defendants' knowing failure to control the activities of STG-affiliated inmates at SCCF, the plaintiff has been continually subjected to physical assault and abuse, in violation of the Eighth Amendment;

(2) as a result of the defendants' permitting violent gangs to control whole units and tiers of the housing units in the prison, the plaintiff has been violently assaulted and seriously injured, in violation of the Eighth Amendment;

(3) in their effort to increase profits, streamline operations, and appear to be "tough on crime," the defendants created dangerous and uncontrolled conditions at SCCF, as a result of which the plaintiff was assaulted and seriously injured and remains at risk of serious harm at all times, in violation of the Eighth Amendment;

(4) as a result of their intentional failure to adequately train staff to deal with STG-affiliated inmates, the defendants created dangerous and uncontrolled conditions that led to the plaintiff's injuries and to his remaining at risk of serious harm, in violation of the Eighth Amendment;

(5) the defendants' intentional failure to adequately train staff to deal with STG-affiliated inmates resulted in the plaintiff's repeatedly being assigned to share a cell with STG members, with no consideration of his lack of compatibility with such inmates, thus creating an inherently dangerous and uncontrollable situation in which the plaintiff was put at serious risk of serious injury, in violation of the Eighth Amendment; and

(6) the defendants' failure to adequately staff the prison created dangerous and uncontrollable conditions that led to the assault and serious injury of the plaintiff and placed him continuously at serious risk of serious injury, in violation of the Eighth Amendment.

(*See id.* at 108–10.)

**B.      Deliberate Indifference to Plaintiff's Serious Medical Needs**

The plaintiff also brings claims arising from prison officials' failure or refusal to treat his serious physical injuries and chronic illnesses. He alleges that the non-medical defendants were deliberately indifferent to his severe head, neck, back and other injuries suffered during the assaults by other inmates and refused to send him for medical treatment after his various assaults. He asserts that the medical personnel denied him treatment for chronic illnesses because of the cost.

More specifically, the plaintiff alleges that, in September 2013, a doctor at the Maury County Regional Medical Center diagnosed the plaintiff as having Hepatitis B and a bacterial infection of the gastrointestinal tract, and sent him back to SCCF with orders for the prison medical staff to treat both conditions. The defendants, however, never gave the plaintiff any treatment for either disorder. The plaintiff alleges that he suffers stomach pain, headaches, nausea, and vomiting, all of which are symptoms of these conditions, and that his symptoms are worsening over time as a result of the lack of

treatment. The plaintiff alleges that he has been denied treatment by the named medical defendants: Mrs. Rashti, head nurse for TDOC; Jane Doe Nurses #1, #2, and #3; Dr. Robert Coble, doctor and acting health administrator for SCCF; and John Doe Doctors #1 and #2. According to the plaintiff, these individuals have recognized that the plaintiff has serious medical conditions but have told him that they are not authorized to provide treatment for his conditions because it is too expensive. In addition, Jane Doe Nurse #3 at SCCF, who saw the plaintiff on December 18, 2015, was "absolutely unhelpful and unprofessional" and refused to provide treatment for the plaintiff's severe symptoms or to refer him to a doctor for follow up.

The plaintiff states that he has been in continuous pain and attempted to get medical attention from the medical staff at SCCF throughout the past three years, to no avail. He filled out sick-call slip after slip-call slip in an attempt to receive treatment. The plaintiff alleges that he has attempted to file grievances about the matter, but as a matter of strict TDOC policy, is not permitted to file a grievance on matters related to healthcare. The plaintiff also alleges that the medical staff's employer, whom he identifies only as Private Sector Employer John Doe Medical Health Services, intentionally instructs its employees as a matter of policy to refuse treatment for expensive and chronic conditions such as the plaintiff's in order to save money and realize higher profits for the company.

The plaintiff alleges that he has repeatedly petitioned defendants Schofield, Woodall, Parker, CCA, Hininger, Medlin, Chapman, Killingsworth, Dodd, McClain, and Buttram, asking that they intervene on his behalf to facilitate his receipt of adequate medical treatment, but they have all refused to intervene despite actual knowledge of his conditions and that he was not being treated as a result of the purported cost of treatment.

The plaintiff also complains that the defendants at SCCF have implemented a policy pursuant to which inmates housed at SCCF are forced to walk with "military precision, in line with their hands behind their back," while being moved from one area to another within the prison. (ECF No. 1, at 120–21.) The plaintiff alleges that the layout of the prison and the hilly terrain make this practice particularly risky and difficult and that it has predictably resulted in numerous falls on wet, slippery concrete in the rain. The plaintiff alleges that he fell and seriously injured himself several times as a result of this practice. The plaintiff avers that the defendants were aware that forcing the plaintiff, "as an older physically small . . .

inmate with a chronic medical condition, and in deteriorating health," to comply with this policy placed him at grave risk of and did actually result in serious physical injury. (*Id.* at 121.) The plaintiff alleges that he continues to be in pain as a result of the untreated injuries suffered as a result of this policy.

Next, the plaintiff takes issue with a prison policy pursuant to which, if he leaves his cell, he cannot enter it again until at least thirty minutes have passed, which means he must wait at least thirty minutes before having access to bathroom facilities. Somewhat confusingly, and without much explanation, he further claims that this practice forces him to leave his cell and enter into the pod area, which is overrun with and controlled by STG-affiliated inmates, because if he does not come out from his cell during the thirty-minute interval and chow call is made for his pod, the plaintiff will not be permitted to eat. Thus, the plaintiff asserts that he is forced to choose between entering the pod area under the control of STG-affiliated inmates, where he risks being assaulted, or skipping meals and starving.

Finally, the plaintiff complains about SCCF officials' inspection policy, which sometimes requires inmates to stand at attention for forty-five to ninety minutes at a time while waiting for prison officials to inspect the housing units and cells. During this inspection period, the plaintiff and other inmates are not permitted to sit down, use the bathroom, walk around, or stretch. The plaintiff alleges that the purpose of this practice is "part and parcel of Defendant Schofield's interpretation of his mandate, by order of the Tennessee State Governor Bill Haslam, to make [each] inmate's time in the TDOC more harsh and punitive and miserable. So as to exact a greater toll psychologically and physiologically." (*Id.* at 123.) The plaintiff's inability to use the bathroom for such extended periods of time has caused him to experience pain and suffering, exacerbated by his chronic and untreated gastrointestinal infection and Hepatitis.

Based upon all of these facts, the plaintiff brings suit under 42 U.S.C. § 1983 and state tort law. He further argues that the statute of limitations does not bar his claims because the defendants' actions and his injuries are still continuing.

The plaintiff seeks relief from the defendants in their official capacity in the form of prospective injunctive and declaratory relief, and he seeks compensatory and punitive damages from the defendants in their individual capacity.

**III. Discussion**

Section 1983 confers a private federal right of action against any person who, acting under color

of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 583 (6th Cir. 2012). Thus, to state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that "the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F. 3d 584, 590 (6th Cir. 2003) (citations omitted); 42 U.S.C. § 1983.

There is no question here that all the defendants, whether employed by CCA, a medical contractor, or the state, are state actors for purposes of a lawsuit under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42, 56 (1988) (a private medical provider contracted to provide medical care to prisoners is a state actor for purposes of § 1983); *Street v. Corrs. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (CCA acts under color of state law because it performs the traditional state function of operating a prison).

Generally speaking, "[t]he Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'" *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Proving an Eighth Amendment claim requires that the plaintiff make a showing of deliberate indifference on the part of prison officials. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)); *see also Estelle v. Gamble*, 429 U.S. 97 (1976).

Deliberate indifference has two components to it: objective and subjective. *Harrison*, 539 F.3d at 518. The objective component first demands a showing that the detainee faced a substantial risk of serious harm. *Id.* The objective component further "requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency"—that is, it "is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). Therefore, the objective component of deliberate indifference is met upon a showing that a detainee faced a substantial risk of serious harm and that such a risk is one that society chooses not to tolerate.

To prove the subjective component, a plaintiff must show that the defendant had "a sufficiently culpable state of mind." *Harrison*, 539 F.3d at 518 (internal quotation marks omitted). This state of mind is shown "where 'the official knows of and disregards'" the substantial risk of serious harm facing the detainee. *Id.* (quoting *Farmer*, 511 U.S. at 837). That is, "the official must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Direct evidence about a defendant's knowledge is not necessary; rather, an individual's subjective knowledge can be inferred from the obviousness of the harm stemming from the risk. *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.").

A.      **The CCA Defendants**

The CCA defendants include CCA itself; CCA President and CEO Damon Hininger; Regional Director Jason Medlin; Arvil Chapman; Cherry Lindamood; and seven other current or former SCCF employees, including Katherine Buttram, Benjamin Killingsworth, Daniel Dodd, Dan Deavers, Christopher McClain, Mark Hacker, and Hank Inman.

As for the individual-capacity claims against the CCA employees, the Court finds that the complaint states colorable claims based upon allegations that the individuals all had personal knowledge of and encouraged the implementation of *de facto* policies at SCCF regarding the treatment of STG-affiliated inmates, the impact of these policies upon the plaintiff personally, and the defendants' refusal to take steps to protect the plaintiff from known and obvious risks associated with the conditions of his confinement at TDOC. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994) ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."); *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (inmate's right to be free from deliberate indifference to assault is clearly established); *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (noting that a prisoner-plaintiff can demonstrate deliberate indifference on the part of individual prison officials by presenting evidence from which a trier of fact could conclude "that the official was subjectively aware of the risk" and "disregard[ed] that risk by failing to take reasonable measures to abate it" (quoting *Farmer*, 511 U.S. at 829, 847)).

Regarding the claims against CCA itself, the entity cannot be held liable solely on the basis that it employs tortfeasors, because "[*r*]*espondeat superior* is not a proper basis for liability under § 1983." *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006). Instead, a private entity can be held responsible for an alleged constitutional deprivation only if there is a direct causal link between a policy or custom of the entity and the alleged constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

694 (1978); *see also Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005) ("Like a municipality, a government contractor cannot be held liable on a *respondeat superior* theory. . . . [A] private contractor is liable for a policy or custom *of that private contractor*. . . ."). Simply stated, the plaintiff must "identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987), *overruled on other grounds by Frantz v. Vill. of Bradford*, 245 F.3d 869 (6th Cir. 2001)).[6]

In this case, the petitioner has identified *de facto* policies which, he alleges, CCA's corporate officers knew about and encouraged, specifically policies involving the classification of potentially violent inmates, the inaccurate or misleading recording of violent incidents, and the treatment of STGs and STG-affiliated inmates at state prisons and SCCF in particular. At this juncture, the Court must accept as true the plaintiff's allegations. According to the plaintiff's allegations, the *de facto* policies at issue have placed the plaintiff at an unreasonable and known risk of harm, in violation of his right to be from cruel and unusual punishment. The Court finds that the plaintiff has stated colorable claims against CCA and, consequently, against CCA's corporate officers in their official capacity. *See Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) ("[I]ndividuals sued in their official capacities stand in the shoes of the entity they represent." (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))).

**B.      The TDOC Defendants**

The TDOC defendants include TDOC Commissioner Derrick Schofield; Deputy Commissioner Jason Woodall; Assistant Commissioner Tony Parker; TDOC Liason Joel Foster; and TDOC contract monitor Bryant Williams. Any claims against the state officials in their official capacity for money damages are subject to dismissal, because "neither a State nor its officials acting in their official capacities are

---

[6] This is the law in the Sixth Circuit and every other circuit that has addressed the issue, but a panel of the Seventh Circuit has recently observed that the matter is deserving of "fresh consideration." *Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 1024 (2015). That court noted that the Supreme Court has never directly considered the question of whether *Monell* applies to private corporations, and that "there are substantial grounds to question the extension of the *Monell* holding for municipalities to private corporations." *Id.* at 790. Specifically, "[i]nsulating private corporations from *respondeat superior* liability significantly reduces their incentives to control their employees' tortious behavior and to ensure respect for prisoners' rights. The results of the current legal approach are increased profits for the corporation and substandard services both for prisoners and the public." *Id.* at 794.

'persons' under § 1983" for purposes of a suit for damages. *Will v. Mich. State Police*, 491 U.S.58, 71 (1989).

However, insofar as the petitioner seeks prospective injunctive relief against the state officials in their official capacity, his claims are not barred by the 11th Amendment or sovereign immunity. *See id.* at 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985))). The Court finds that the plaintiff states official-capacity claims against the TDOC officials for the same reason that he states official-capacity claims against CCA and the CCA officials: TDOC officials allegedly knew about and encouraged specific policies, written and unwritten, involving the classification of potentially violent inmates, the inaccurate or misleading recording of violent incidents, and the treatment of STGs and STG-affiliated inmates at state prisons and SCCF in particular. The plaintiff also alleges facts which, if true, establish a causal connection between the continued implementation of these policies at SCCF and his injuries, and he seeks prospective injunctive relief.

The Court also finds that the plaintiff states colorable claims against defendants Schofield, Woodall, Foster, and Williams and Woodall in their individual capacities, based upon the plaintiff's allegations that they were personally involved in the promulgation and the implementation of the policies that injured the plaintiff and had actual knowledge about the effect of such policies on the plaintiff and others. *See Miller v. Calhoun Cnty*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (the plaintiff must allege the personal involvement of each defendant in the events giving rise to his claims, in order to state a cause of action against that individual).

For purposes of the initial review, the Court finds that these claims too should be permitted to proceed.

### C. The Medical Defendants

The plaintiff's claims against medical personnel at SCCF are based on the individuals' alleged failure to provide adequate medical care. The Eighth Amendment, by its terms, prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. In its application by the courts, the Eighth Amendment has been specifically construed to prohibit the

"unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion), and conduct repugnant to "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion). While the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), it does require humane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The amendment imposes affirmative duties on prison officials to "assume some responsibility for [each prisoner's] safety and general well-being," and to "provide for his basic human needs," including medical care. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). "Contemporary standards of decency require no less." *Helling*, 509 U.S. at 32 (citing *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976)).

In *Estelle*, the Supreme Court concluded that, although accidental or inadvertent failure to provide adequate medical care to a prisoner would not violate the Eighth Amendment, "deliberate indifference to the serious medical needs of prisoners" violates the Eighth Amendment, because it constitutes the "unnecessary and wanton infliction of pain" contrary to contemporary standards of decency. *Id.* at 104. Under this analysis, what constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the alleged constitutional violation, but the Supreme Court has clarified that the question of whether a prisoner's claim based on prison officials' failure to provide adequate medical care involves both a subjective and an objective component.

The objective prong asks whether the harm inflicted by the conduct is sufficiently "serious" to warrant Eighth Amendment protection. *Hudson v. McMillian*, 503 U.S. 1, 8–9 (1992). The Sixth Circuit has defined a "serious medical need" as "either one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 570 (6th Cir. 2013) (quotation marks and citations omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or

omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

In this case, the plaintiff alleges that each of the named individuals involved in his medical treatment were personally aware that he had serious medical conditions or had suffered serious injuries but failed to provide necessary medical care for those injuries. The individual-capacity claims against Mrs. Rashti; Jane Doe Nurses #1, #2, and #3; Dr. Robert Coble; and John Doe Doctors #1 and #2 that are based on such allegations will be permitted to proceed.

The plaintiff also alleges that the John Doe Medical Health Services is liable to him in its official capacity on the basis that it promulgates policies, which the individual medical practitioners are required to follow, pursuant to which necessary medical care is denied to prisoners with chronic conditions because the care is deemed to be too expensive. The plaintiff alleges that he is a prisoner with chronic conditions to whom care has been denied on the basis of cost. The Court finds, for purposes of the initial review, that the plaintiff states a colorable claim against the John Doe Medical Health Services contractor on this basis.

## IV. Conclusion

For the reasons set forth herein, to the extent that the complaint may be construed to seek monetary damages against state employees in their official capacity, such a claim will be dismissed for failure to state a claim for which relief may be granted. The remaining claims will be permitted to proceed. An appropriate order is filed herewith.

KEVIN H. SHARP
Chief Judge
United States District Court